**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KEVIN C. McKEVITT**
                                        **Plaintiff,**

        **-against-**                                        **11-CV-970**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

                                        **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


## DECISION & ORDER

## I.  INTRODUCTION

        Kevin McKevitt ("Plaintiff") brought this suit under the Social Security Act ("Act"), 42

U.S.C. § § 405(g), 1383(c)(3) to review a final determination of the Commissioner of

Social Security ("Commissioner") denying his application for disability insurance benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff alleges that the decision of the

Administrative Law Judge ("ALJ") denying his applications for benefits was not supported

by substantial evidence and was contrary to the applicable legal standards.  The

Commissioner argues that the decision was supported by substantial evidence and made

in accordance with the correct legal standards. Pursuant to Northern District of New York

General Order No. 8, the Court proceeds as if both parties had accompanied their briefs

with a motion for judgment on the pleadings.

1

## II. BACKGROUND

### A. Procedural History

Plaintiff protectively filed applications for DIB and SSI on May 13, 2009, which were denied. Tr. 99-102, 103-06.  Plaintiff and his attorney appeared at an administrative hearing held on December 23, 2010, before Administrative Law Judge (ALJ) Robert Gonzalez, who denied Plaintiff's claim on January 31, 2011. Tr. 7-19. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on June 24, 2011. Tr. 1-4. This action followed.

### B.    Medical Evidence

On September 16, 2008, Plaintiff was involved in a motor vehicle accident. T 117,189. He was taken to the emergency room at Benedictine Hospital where he complained of low back pain. T 189, 192. X-rays showed degenerative disc disease and osteoarthritis at lower thoracic and lumbar levels. T 194. On examination, he was mildly tender to midline at approximately the L4 vertebra. T 193. Alexis Cordiano, M.D. stated that the differential diagnosis included compression fracture, as well as musculoskeletal strain and spasm secondary to motor vehicle crash. T 193. Dr. Cordiano noted: "However, given that the patient is overweight and obese, a small slight compression fracture can cause pain later on as inflammation starts to accumulate." T 193. Plaintiff was discharged with "Tylenol, Motrin, ice, taking it easy, no heavy exertion, lifting or exercise." T 191.

On the following day, September 17, 2008, Plaintiff returned to the emergency room with complaints of upper back and neck discomfort. T 189. On examination, he exhibited tenderness in the region of the left trapezius region, slightly exacerbating pain. T

189. He was diagnosed as suffering from upper back strain. T 189. He was prescribed Flexeril and advised to continue taking Ibuprofen as needed for pain. T 189.

On October 1, 2008, Plaintiff began treating with Luis A. Mendoza, Jr., M.D. T 285-87. His chief complaint was of moderate to severe pain in the lower back as a result of his accident. T 285. On thoracic lumbar examination, he showed a restricted range-of-motion to the thoracic/lumbar spine with flexion at 71 degrees (normal 90 degrees), extension 21 degrees (normal 30 degrees), right and left rotation 23 degrees (normal 30 degrees), and right and left lateral flexion 22 degrees (normal 30 degrees). T 286. There were spasms on palpation and inspection to the thoracic/lumbar para-vertebral muscles from T10 to S1. T 286. Dr. Mendoza diagnosed him as suffering from a lumbar sprain/strain and lumbar muscle spasms. T 286. Dr. Mendoza recommended that Plaintiff undergo physical therapy and continue taking oral medications. T 287. Dr. Mendoza also recommended that Plaintiff avoid all activities that may exacerbate his condition and opined that he was temporarily totally disabled. T 287.

On October 7, 2008, Plaintiff underwent an MRI without contrast of his lumbar spine. T 235-36. The MRI showed multiple Schmorl's Nodes. T 236. The largest Schmorl's Node was at L5-S1 and was associated with some marrow edema, suggesting it may be acute or subacute. T 236. There was a relatively narrow spinal canal on a congenital basis. T 236. There was a two centimeter lesion in the S3 segment that most likely was a hemangioma. T 236. There were minor disc bulges at L3-4 and L4-5 with "some compromise of the ventral cerebrospinal fluid shadow." T 384; see T 235. At L5-S1, there was some bulging of the disc more to the right. T 235.  Right foraminal stenosis "and some compression of the right S1 root more than the left." T 235.

3

From October 10, 2008 to December 5, 2008, Plaintiff underwent nineteen physical therapy sessions at Kingston Hospital Sports and Physical Medicine Center. T 225-42.

On November 10, 2008, Plaintiff began treating with Steven K. Jacobs, M.D., Ph.D., a neurosurgeon at New York Neurosurgical. T 306-07, 376-77. On examination, Plaintiff showed weakness of the plantar and dorsiflexors. T 306, 378. An MRI demonstrated bulging discs at L4-5 and L5-S1 with neuroforaminal stenosis. T 306, 378. Dr. Jacobs referred Plaintiff for a series of lumbar epidural injections. T 306, 378. In addition, Dr. Jacobs "stressed . . . the importance of trying to lose some weight as he presently is 5'9" and weighs 270 lbs." T 378; see Exhibit 1 (Body Mass Index Calculation).

On December 9, 2008 and February 3, 2009, Plaintiff underwent a left lumbar facet joint injection at L4-L5 and L5-S1, which was performed by Dr. David Gamburg, an anesthesiologist, at the Pain Treatment Center at The Kingston Hospital. T 360, 362, 364.

From February 24, 2009 to May 6, 2009, Plaintiff returned to physical therapy and underwent sixteen physical therapy sessions due to his low back sprain at Kingston Hospital Sports and Physical Medicine Center. T 210-42. His diagnosis was low back pain, status post facet. T 210.

On July 1, 2009, Plaintiff was examined by Alan Ng, M.D. T 243-44. Plaintiff complained of experiencing low back pain radiating to the right hip and knee. T 243. On neurological examination, the sensation in the right L5-S1 dermatone was decreased to light touch and proprioception. T 244. The lumbar spine examination showed that palpation showed tenderness in the paraspinals L5-S1. T 244.  Range-of-motion was restricted to 50 degrees flexion and 15 degrees extension. T 244.  He showed muscle weakness in the right knee with muscle strength 4/5. T 244.  Straight leg raising was

positive on the right lower extremity. T 244. Dr. Ng opined that Plaintiff was "partially disabled and should avoid heavy lifting." T 244. Dr. Ng performed EMG nerve conduction testing, which revealed evidence of right L5-S1 lumbar radiculopathy. T 248. Decreased response of left peroneal nerve may suggest a left peroneal neuropathy. T 248. Dr. Ng diagnosed him as suffering from lumbar strain, lumbar radiculopathy vs. localized peripheral neuropathy of the lower extremities, and limb pain. T 244.

On July 16, 2009, Plaintiff underwent an orthopedic examination by Suraj Malhotra, M.D. T 196. His chief complaint was low back pain since the automobile accident. T 196. On examination, his height was 5'7" and weight was 291 pounds. T 197. His Body Mass Index ("BMI") was 45.4. He could squat only 3/4 of the distance due to back pain. T 197. He was limited in flexion and extension to 75 degrees. T 197. The straight leg raise test was positive slightly supine at 85 degrees on the right and left side. T 197. Dr. Malhotra diagnosed him as suffering from obesity and lumbosacral intervertebral disk disease with pain. T 198. Dr. Malhotra opined that he had a mild limitation in bending and carrying heavy objects. T 198.

On September 28, 2009, an MRI of Plaintiff's lumbar spine without contrast was performed. T 252. The MRI showed multiple Schmorl's nodes and a sacral hemangioma, which were stable. T 252. The spinal canal was narrow on a congenital basis. T 252. Very mild bulging of the L3-4 and L4-5 discs contributed to central spinal stenosis. T 252.

On October 22, 2009, Plaintiff underwent an L4, L5, and S1 lumbar laminectomy with foraminotomies over the L5 and S1 nerve roots. T 253, 306. He also underwent an arthrodesis and fusion at L4-5 and L5-S1 bilaterally. T 253, 306. The preoperative and postoperative diagnoses were spinal and neuroforaminal stenosis at L4-L5, L5-S1, and

5

degenerative disc disease at L4-L5, and L5-S1. T 253.

On November 6, 2009, Plaintiff underwent an orthopaedic independent medical examination by Paul Jones, M.D., an orthopeadic surgeon. T 342-44. Plaintiff presented with a lumbar support. T 343. On examination, Plaintiff reported absent sensation to pinprick in "his entire right lower extremity." T 343. Straight leg raising was positive on the left side when supine at about 60 degrees. T 343. Dr. Jones' diagnosis was status post recent low back surgery. T 344. He advised Plaintiff that he should use his lumbar support until the area has started to fuse. T 344. Dr. Jones opined that Plaintiff has a temporary total disability. T 344.

On December 1, 2009, Plaintiff underwent an independent neurological evaluation by Patrick J. Hughes, M.D. T 345. Plaintiff complained of experiencing low back pain that is constantly present and is moderate to severe. T 346. Plaintiff complained that he experiences "pins and needles" and numbness in the anterior aspect of the right thigh, which occurs most of the time. T 346. He was wearing a back brace. T 347. It was observed that Plaintiff was able to walk unaided, and had no problems getting on and off the examining table. On examination, Plaintiff's height was 5'10" and weight was 295 pounds. T 346. Reflexes were one plus and symmetrical. T 347. Ankle jerks were absent. T 347. Dr. Hughes opined that Plaintiff was status post spinal fusion at L4-5 and L5-S1 with continuing complaints of pain. T 352. He opined that Plaintiff had a temporary total disability. T 352.

On March 9, 2010, Plaintiff treated with Dr. Jacobs. T 312-13. Plaintiff "continues to complain of some back pain. Numbness is the same." T 312. His condition was about the same as the last visit. T 312. He was taking his medication as prescribed. T 312. Dr.

Jacobs' assessment was lumbar sprain and strain. T 313. Dr. Jacobs referred Plaintiff for pain management and possible injections with Dr. Rosenblatt. T 313.

On March 11, 2010, Plaintiff began treating with Marc J. Rosenblatt, D.O. T 303-05. Evaluation of the thoracolumbar spine revealed bilateral paraspinal spasm with multiple trigger points, as well as limitations of range-of-motion seen in multiple planes. T 304. Plaintiff reported undergoing facet blocks, which were performed by Dr. Gamberg, but the benefits lasted only two weeks. T 305. Dr. Rosenblatt found that Plaintiff was a candidate for interventional pain procedures, including, but not limited to, epidural steroid injections and selective nerve root blocks. T 305.

On March 25, 2010, Plaintiff began physical therapy with Mark Garcia, P.T. T 327. He subsequently underwent 34 treatments, through October 6, 2010, that consisted of an initial examination, moist heat, ultrasound, lower abdominal strengthening exercises, bicycle, upper body ergonomics, and a home exercise program. T 327. Physical therapist Garcia opined that Plaintiff's low back pain remained with continued persistent pins and needles in the right anterior thigh region. T 327.

On April 13, 2010 and May 11, 2010, Dr. Rosenblatt performed a caudal epidural block, as well as a bilateral L5-S1 selective paraspinal nerve root blocks. T 294, 298, 301. Plaintiff's diagnoses were lumbosacral radiculopathy and  post-laminectomy syndrome. T 299, 301.

On May 24, 2010, Plaintiff treated with Dr. Jacobs. T 310-11. Plaintiff reported falling during the previous week "and has had some increased back pain." T 310. He stated that his leg gave out. T 310. Dr. Jacobs' assessment was lumbar sprains and strains. T 311. Plaintiff would continue working with Dr. Rosenblatt for pain management.

T 311.

On June 8, 2010, Dr. Rosenblatt performed a caudal epidural block, as well as a left L5-S1 selective paraspinal nerve root block. T 295-96. Plaintiff's diagnoses were lumbosacral disc disease and post-laminectomy syndrome. T 296.

On August 10, 2010, Plaintiff treated with Dr. Rosenblatt. T 292-93. Plaintiff complained of a high level of pain and his legs go out on him. T 292. He reported falling at home in his bedroom on May 19, 2010. T 292. Dr. Rosenblatt told him that there was nothing additional that he could offer him. T 292. He may be a candidate for a possible dorsal column stimulator. T 292. Dr. Rosenblatt referred him to the Pain Clinic in New York. T 292.

On September 21, 2010, Plaintiff treated with Dr. Jacobs. T 308-09. Plaintiff reported experiencing increased back pain since his fall in May of 2010. T 308-09. In a separate document dated September 21, 2010, Dr. Jacobs reviewed his treatment of Plaintiff and positive MRI and EMG results. T 306-07. Dr. Jacobs concluded as follows:

> I believe there is a casual relationship between the patient's back pain and the motor vehicle accident of September 16, 2008. I believe that this accident was the direct cause of the bulging disc seen at L4-5 and L5-S1. At the time of the surgery, there was significant neuroforaminal stenosis which was in part related to the fact that the discs were bulging at L4-5 and L5-S1.
>
> The patient will have a permanent disability as a result of the motor vehicle accident and the ensuing surgery. He will have limitations in what he can and cannot do as a result of the surgery and the lumbar fusion. He may become more prone to injury at the disc space above the fused levels, i.e., at L3-4 by virtue of the fact that L4-5 and L5-S1 have undergone fusion.

T 307.

On October 5, 2010, Dr. Mendoza completed a Medical Source Statement of

8

Plaintiff's Ability to Do Work-Related Activities (Physical). T 324-26. Dr. Mendoza indicated that Plaintiff could only occasionally lift and/or carry less than ten pounds; frequently lift and/or carry ten pounds; stand and/or walk less than 2 hours in an 8-hour workday; sit less than about 6 hours in an 8-hour workday; must periodically alternate sitting and standing to relieve pain or discomfort; and was limited in his abilities to push and/or pull. T 324-35. Dr. Mendoza also opined that Plaintiff had postural limitations. Specifically, he could never climb, balance, crawl, or stoop. T 325. He could only occasionally kneel or crouch. T 325. Dr. Mendoza further opined that Plaintiff had environmental limitations. T 326. Specifically, he was limited in his exposure to temperature extremes, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, or gases. T 326. Dr. Mendoza specified that his findings were supported by Plaintiff's status post discectomy lumbar with fusion; lumbar disc injuries; lumbar radiculopathy; and lumbar sprain/strain. T 325.

On October 1, 2010, Plaintiff underwent another orthopaedic independent medical examination by Dr. Jones. T 353-55. On examination, forward flexion was to 30 degrees. T 354. This represented a loss of about 60% of forward flexion. *See* Exhibit 2 (Range of Joint Motion Evaluation Chart). Twisting and turning was to 20 degrees with 10 degrees of extension. T 354. The right sciatic notch was slightly tender to palpation. T 354. Ankle jerk reflexes were 1+. T 354. He reported diminished sensation to pinprick on the lateral aspect of his right leg. T 354. In a sitting position, straight leg raising was positive at 80 degrees on the right side. T 354. When supine, straight leg raising was positive at 45 degrees bilaterally. T 354. Dr. Jones' diagnosis was failed back syndrome. T 354. Dr. Jones noted that Plaintiff was using a low back support and cane at the time. He also noted that Plaintiff had no problems with the heel/toe walking, and that Plaintiff was

observed walking about the office without using the cane for support. Dr. Jones opined that Plaintiff was a candidate for pain management; that Plaintiff "had a marked disability;" and that he "can only do sedentary work with no bending, lifting, or reaching. He must be able to change positions as needed." T 354.

On October 7, 2010, Plaintiff underwent a neurosurgical independent medical examination by Arnold Goran, M.D. T 381-90. It was observed that Plaintiff used a cane, but his gait was not antalgic. Plaintiff had some difficulty getting on and off the examining table and taking off and putting on his shoes and socks. T 388. Plaintiff's current complaints in order of severity included back pain "24/7", which is much worse than pre-operatively, insomnia due to sleeping less than 90 minutes at a time, and right lower extremity pain and paresthesias which were constant and more severe than pre-operatively. T 383. The right leg symptoms do not radiate below the knee. T 383. Plaintiff's range-of-motion of the lumbar spine was limited. T 389. His flexion was 25 degrees (expected normal 60 degrees); extension was 10 degrees (expected normal 25 degrees); and right and left lateral flexion (expected normal 25 degrees each). T 389. Straight leg raising on the right was 60 degrees supine and 60 degrees sitting (expected normal 80-90 degrees). T 389. Straight leg raising on the left was 45 degrees with production of back pain supine and 60 degrees sitting (expected 80-90 degrees). T 389. Ankle jerk reflexes were 1+ (expected normal 2+). T 389. There was a decreased appreciation of vibration and pin involving the right lower extremity which extended to the inguinal ligament. T 389. Dr. Goran diagnosed Plaintiff as suffering from chronic low back pain and right sciatica (symptom based diagnosis), L5-S1 radiculopathy (diagnosis based on examination and EMG), and status post-decompression and fusion L4-5, L5-S1. T 389.

Further neurological care was medically necessary for his related injuries. T 389. Dr. Goran indicated that Plaintiff was unable to work at his usual occupation. T 389.

## C. Plaintiff's Testimony

At the hearing, Plaintiff stated that he was forty-six years old. T 26. He reached the twelfth grade in high school. T 26. He did not obtain a diploma. T 30. He lives in his mother's house with his sister, two nieces, and nephew. T 27. His nieces and nephew do everything in the house. T 35. Plaintiff used to "do it all." T 35.

For the past fifteen years, Plaintiff worked as an "all around maintenance handyman." T 28. He performed painting, plumbing, lighting, electrical, demolition, and floors. T 28.

In September of 2008, Plaintiff was involved in a motor vehicle accident. T 27. In October of 2009, he underwent surgery. It only helped his pain and symptoms until about March. T 29. In March, his back started bothering him again. T 29. In May, his right leg started falling out from underneath him. T 29. His leg has fallen out a couple of times. T 30. His sister found him sitting on a large freezer unit in Walmart. T 30. Plaintiff takes Percocet, Naprosyn, and Robaxin for his pain. T 30. Robaxin is a generic muscle relaxer. T 30-31. He takes Percocet for the constant pain in his lower back and right leg. T 32. On a normal day, the pain is about a 7 or 8 on a scale of 1 to 10. T 32. When he takes his medication, his pain goes down to a 4. T 32. He experiences side effects from his medications. T 32. He experiences drowsiness, fatigue, and a desire to sleep. T 33. Plaintiff uses a cane every day while in his house and when he goes out. T 39. He bought the cane in a drugstore on the same day that he suffered a fall in May of 2010. T 39-40. During the fall, he hurt his back and bruised his right arm from the shoulder to the

11

elbow. T 40. He stated that he fell because he "went to take a step and my leg just felt like it wasn't even there." T 40. He stated that his leg has given out about a dozen times, if not more, since this incident. T 40. He also uses his mother's walker if his cane is on the other side of the room. T 39-40.

## D. Documentary Evidence

In a Disability Report, Plaintiff stated, "I cannot sleep [well]. Every 2-3 hours I am awake." T 129. He contended that his lower back pain prevents him from performing yard or housework, and limits the amount of time he can drive. T 131.  He asserted that he cannot drive for more than 30 minutes before experiencing pain, T 131, and does not perform lifting, squatting, and kneeling due to pain. T 133. He contended that he climbs stairs very slowly and carefully, T 133, and uses an IF-3 wave machine every day for pain management. T 134. He asserted that he can walk two blocks before he needs to stop and rest for a few minutes. T 134.

## III. DISCUSSION

## A. Standard of Review

The Court's review of the Commissioner's determination is limited to two inquiries. *See* 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990); *Shane v. Chater*, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997)(Pooler, J.)(citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must determine whether the Commissioner's findings are supported by

substantial evidence in the administrative record. *See Tejada*, 167 F.3d at 773; *Balsamo*, 142 F.3d at 79; *Cruz*, 912 F.2d at 11; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also, Perez*, 77 F.3d at 46; *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine de novo whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted). In the context of Social Security cases, substantial evidence consists of "'more than a mere scintilla'" and is measured by "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 842 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L. Ed. 126 (1938)). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir.1 982)); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). However, although the reviewing court must give deference to the Commissioner's decision, the Act is ultimately "'a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion.'" *Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

## B. Analysis

### 1. The Framework for the Commissioner's Decision

To receive federal disability benefits, an applicant must be "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. § 423(a),(d). A claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Agency rules promulgated under the Act outline a five-step analysis to determine disability. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

> (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work; (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Carter, 221 F.3d 126, 132 (2d Cir. 2000).

## 2. The Commissioner's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 16, 2008, the alleged onset date. Tr. 12. At step two, the ALJ found that Plaintiff's obesity and spinal condition affecting his lumbar spine, status- post surgery for a lumbar fusion and laminectomy, were "severe" impairments. *Id.* At step three, the ALJ found that Plaintiff's impairments, although severe, did not individually or in combination meet or equal any of the criteria of a section of the Listing of Impairments (Listings), set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 13. Prior to proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity and concluded that he retained the ability to perform sedentary work. Tr. 13. More specifically, the ALJ found that Plaintiff could sit for six hours and stand/walk for two hours during the course of an eight-hour workday. Plaintiff could also lift/carry items weighing ten pounds and could occasionally bend and reach. The ALJ added that Plaintiff needed to have the option to sit or stand at will during the course of the workday. *Id.* At step four, the ALJ concluded that Plaintiff was unable to return to his past relevant work as a maintenance worker/handyman because the exertional requirements of that job exceeded his residual functional capacity. Tr. 18. At step five, the ALJ considered Plaintiff's age, education, and residual functional capacity and concluded that he was not disabled because jobs existed in significant numbers in the national economy that he could perform. Tr. 18-19. In this regard, the ALJ stated that Plaintiff's "ability to only perform bending and reaching occasionally and his need to have the option to sit or stand

15

at will during the course of the workday has little or no effect on the occupational base of unskilled sedentary work." Thus, the ALJ denied Plaintiff's claim for disability insurance benefits. Tr. 19.

## F. Plaintiff's Arguments

Plaintiff argues: 1. The ALJ failed to combine the effects of Plaintiff's impairments; 2. The ALJ erred by failing to find that Listing 1.04A was met and by failing to provide a supporting rationale in this regard; 3. The ALJ erred in analyzing the medical opinions, which rendered the Residual Functional Capacity finding unsupported by substantial evidence; 4. The ALJ failed to apply the appropriate legal standards when he found Plaintiff not credible; 5. The ALJ's step 5 determination is not supported by substantial evidence and is the product of legal error. The Court will address these arguments seriatim.

### 1. Combined Effects of Plaintiff's Impairments

As Defendant argues, the ALJ did consider the combined effect of Plaintiff's impairments, including obesity, at step 2. *See* Tr. 13 (The ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments...."). Plaintiff counters, however, that the ALJ misapplied the Commissioner's instructions in evaluating and explaining his ultimate finding about Plaintiff's residual functional capacity, and in evaluating the combined effects of those impairments at that stage of the analysis.[1]

---

[1]The ALJ noted, in concluding that Plaintiff had the RFC for sedentary work, that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence..." Tr. 16.

The record demonstrates that the ALJ conducted an exceedingly thorough review of the medical and testimonial evidence related to Plaintiff's back injury and condition in arriving at Plaintiff's residual functional capacity.  That review does not explicitly  reference an analysis of the effects of the pain that Plaintiff experienced from this injury and subsequent operation, and does not explicitly reference an analysis of the effects of Plaintiff's obesity.  However, while both conditions were referenced in the record, Plaintiff did not present substantial evidence of the effects these conditions had on him.  Further, "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand .... When an ALJ's decision adopts the physical limitations suggested by reviewing doctors after examining the Plaintiff, the claimant's obesity is understood to have been factored into their decisions." *Yablonski v. Comm'r of Soc. Sec.*, No. 6:03–CV–414, 2008 WL 2157129, at *6 (N.D.N.Y. Jan. 31, 2008) (Treece, M.J.)( citations and interior quotation marks omitted).  Still further, the ALJ found that Plaintiff only had the ability to perform unskilled sedentary work, concluding that the "ability to only perform bending and reaching occasionally and his need to have the option to sit or stand at will during the course of the workday has little or no effect  on the occupational base of unskilled sedentary work." *See Martin v. Astrue*, 337 Fed.  Appx. 87, 90 (2d Cir. 2009)("Sedentary work 'entails no significant stooping.'")(quoting SSR 83-10).  The Court does not find that the ALJ erred in his analysis in this regard.

### 2. Listing 1.04A Finding

Next, Plaintiff argues that the ALJ erred by failing to find that Listing 1.04A was met and by failing to provide a supporting rationale in this regard.

A claimant is automatically entitled to benefits if [his] impairment(s) meets the criteria set forth in Appendix 1 to Subpart P of Part 404. *McKinnev v. Astrue*, 2008 WL 312758, *4 (N.D.N.Y.2008). The burden is on the plaintiff to present medical findings which show that [his] impairments match a listing or are equal in severity to a listed impairment. *Zwick v. Apfel*, 1998 WL 426800, at *6 (S.D.N.Y.1998). In order to show that an impairment matches a listing, the claimant must show that [his] impairment meets all of the specified medical criteria. *Pratt v. Astrue*, 2008 WL 2594430, at *6 (N.D.N.Y.2008) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)) (holding that if a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify). Courts have required an ALJ to provide an explanation as to why the claimant failed to meet or equal the Listings, "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Rockwood v. Astrue*, 614 F. Supp.2d 252, 273 (N.D.N.Y.2009) (citation omitted). If an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing, a Court may still uphold the ALJ's determination if it is supported by substantial evidence. *Id.* (citing *Berry v. Schweiker*, 675 F .2d 464, 468 (2d Cir.1982)).

*Beebe v. Astrue*, 2012 WL 3791258, at *2 (N.D.N.Y. Aug. 31, 2012).

In order to meet or equal Listing 1.04A for a spine disorder (e.g. herniated nucleus pulposis, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), Plaintiff had to show he had a compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neruo-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated weakness or muscle weakness) accompanied by sensory or reflex loss and if there is involvement of the lower back, a positive straight-leg raising test (sitting and supine). 20 C.F.R., Part 404, Subpart P, Appendix 1, Section 1.04.  To meet a listed impairment, it is not enough that Plaintiff have one or some of the required criteria; he has the burden of satisfying all of the specified medical criteria. *Sullivan v.* Zebley, 493 U.S. 50 (1990). The evidence does not support the conclusion that Plaintiff's back impairment

18

was of listing-level severity. "Furthermore, the ALJ's failure to provide a specific rationale for finding Plaintiff's spinal impairment did not meet Listing 1.04A does not prevent this Court from upholding his determination because substantial evidence . . . supports the ALJ's determination." *Rockwood v. Astrue*, 614 F. Supp.2d 252, 273 (N.D.N.Y. 2009).

### 3. Treating Physician Rule

Plaintiff argues that the ALJ erred in analyzing the medical opinions, which rendered the Residual Functional Capacity finding unsupported by substantial evidence. In this regard, Plaintiff asserts that the ALJ erred by failing to give controlling weight to Dr. Mendoza's opinions.

Under the "treating physician's rule,"[2] the ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. In this regard, the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of

---

[2]"The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." *de Roman v. Barnhart*, No.03-Civ.0075, 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

the treating physician, and (6) other factors that are brought to the attention of the court. C.F.R. § 404.1527(d)(1)-(6); *see also de Roman v. Barnhart,* No.03-Civ.0075, 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003); *Shaw*, 221 F.3d at 134; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998).

The ALJ found that Plaintiff retained the RFC to perform sedentary work but can only perform bending and reaching occasionally and must have the option to sit or stand at will during the course of the workday. T 13. In making this determination, the ALJ stated that he afforded "some weight" to opinions rendered by Dr. Mendoza on October 1, 2008 and October 5, 2010. T 18.

Regarding Dr. Mendoza's opinions, on October 1, 2008, he opined that Plaintiff should avoid all activities that may exacerbate his condition and that he was temporarily totally disabled. T 287.  On October 5, 2010, Dr. Mendoza completed a Medical Source Statement of Plaintiff's Ability to Do Work-Related Activities (Physical). T 324-26. Dr. Mendoza indicated that Plaintiff could only occasionally lift and/or carry less than ten pounds; frequently lift and/or carry ten pounds; stand and/or walk less than 2 hours in an 8-hour workday; sit less than about 6 hours in an 8-hour workday; must periodically alternate sitting and standing to relieve pain or discomfort; and was limited in his abilities to push and/or pull. T 324-35. Dr. Mendoza also opined that Plaintiff had postural limitations. Specifically, he could never climb, balance, crawl, or stoop. T 325. He could only occasionally kneel or crouch. T 325. Dr. Mendoza further opined that Plaintiff had environmental limitations. T 326. Specifically, he was limited in his exposure to temperature extremes, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, or gases. T 326.

The ALJ stated that he afforded only some weight to these opinions because "the opinion relied heavily on the claimant's subjective complaints and contrasts with reports from the claimant's treating surgeon, Dr. Jacobs as to the claimant's improvement." T 18. However, Dr. Mendoza stated that his latter opinion was based on Plaintiff's status post discectomy lumbar with fusion; lumbar disc injuries; lumbar radiculopathy; and lumbar sprain/strain. T 325. Dr. Mendoza also had a history of treating Plaintiff, which included numerous physical examinations and abnormal findings made before he rendered his opinion. *See* T 256-87, 334-41. Further, Dr. Mendoza's opinions do not completely contrast with Dr. Jacob's reports. Just weeks before Dr. Mendoza completed the Medical Source statement, Dr. Jacobs stated:

> The patient will have a permanent disability as a result of the motor vehicle accident and the ensuing surgery. He will have limitations in what he can and cannot do as a result of the surgery and the lumbar fusion. He may become more prone to injury at the disc space above the fused levels, i.e., at L3-4 by virtue of the fact that L4-5 and L5-S1 have undergone fusion.

T 307 (09/21/10). Dr. Jones opined that Plaintiff could perform sedentary work with no bending or reaching.

Further, because stooping is a form of bending, *see* SSR 85-15, there appears to be consistency in the two opinions. Moreover, on October 1, 2010, Dr. Jones opined that Plaintiff "had a marked disability" and that he "can only do sedentary work with no bending, lifting, or reaching. He must be able to change positions as needed." T 354. The ALJ stated that he afforded "great weight" to this opinion, T 16, which is not substantially different than Dr. Mendoza's opinion. Dr. Malhotra's opinion that Plaintiff suffered from obesity and lumbosacral intervertebral disk disease with pain (T 198) also appears to be consistent with Dr. Mendoza's opinion.

21

There is no basis for reversal and remand because the ALJ determined that

Plaintiff could only perform unskilled sedentary work, which is not inconsistent with Dr.

Mendoza's opinions.  Thus, Plaintiff suffered no prejudice by the ALJ's determination in

this regard.

### 4.  Plaintiff's Credibility

Next, Plaintiff argues that the ALJ erred in his assessment of Plaintiff's credibility.

An ALJ has discretion to evaluate the credibility of a claimant and to make an independent

judgment based on medical findings regarding the true extent of the claimant's symptoms.

*Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984); *Dumas v. Schweiker*, 712 F.2d 1545,

1553 (2d Cir. 1983). It is the function of the Commissioner, not the reviewing court, to

"resolve evidentiary conflicts and to appraise the credibility of witnesses, including the

claimant." *Caroll v. Sec'y of Health and Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983);

*see Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n. 6 (S.D.N.Y. 1995)(An ALJ's

determination with respect to the credibility of witnesses is given great deference because

the ALJ heard the testimony and observed the demeanor of the witnesses.). Further,

Plaintiff must produce appropriate, probative evidence in support of any subjective

statements of symptoms, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4), and the ALJ's

decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing

court unless it is clearly erroneous. *Centano v. Apfel*, 73 F. Supp.2d 333, 338

(S.D.N.Y.1999).

When an individual has a medically determinable impairment that could reasonably

be expected to produce the symptoms alleged, but the objective evidence does not

substantiate the alleged intensity and persistence of the symptoms, the ALJ considers

other factors in assessing the individual's subjective symptoms. These factors include: (1) Plaintiff's daily activities; (2) the nature, duration, frequency and intensity of his symptoms; (3) precipitating and aggravating factors; (4) the type of medication and other treatment or measures which Plaintiff uses to relieve pain and other symptoms; (5) treatment other than medication Plaintiff has received for relief of pain and other symptoms; (6) any other measures used by Plaintiff to relieve pain and other symptoms; and (7) other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The medical and non-medical evidence, including Plaintiff's statements about his activities and functional abilities, did not support his allegations of a complete inability to work. Plaintiff's allegations of total disability were not entirely credible because they were inconsistent with the objective medical evidence which reflects, as shown above, full muscle strength, no muscle atrophy, and intact sensation.  Moreover, on a Patient History Form (PHF) dated February 18, 2009, Plaintiff stated that he was not limited in his ability to stand or walk and had only "some difficulty," as opposed to "significant difficulty," sitting. Tr. 222.  On a PHF dated May 6, 2009, Plaintiff stated that he had only mild pain that "comes and goes" and could sit in any chair as long as he liked. Tr. 212. In an undated PHF, Plaintiff stated that since September 16, 2008, when he was involved in a motor vehicle accident, he was not limited in his ability to sit, stand, or walk. Tr. 239.

Also, the ALJ noted Plaintiff was observed to ambulate with a cane (Tr. 304, 330), but that the evidence did not reflect that it was prescribed by a physician or was medically necessary. Tr. 17- 18.  In fact, Dr. Jacobs consistently reported that plaintiff walked with a

23

normal gait. Tr. 310-11 (May 2010), 312 (March 2010), 317 (November 2009, two weeks after lumbar surgery), 319 (October 19, 2009), 321 (September 22, 2009), 323 (August 2009). Tr. 17-18. Also, when Dr. Rosenblatt noted in his treatment notes that Plaintiff ambulated with a cane, the doctor simultaneously found that Plaintiff's motor evaluation was full at 5/5 throughout, sensation was intact, and deep tendon reflexes were symmetrical. Tr. 304. Thus, as found by the ALJ, Plaintiff's alleged need to ambulate with a cane is not supported by the objective medical findings. Tr. 17-18.

Further, the ALJ noted that Plaintiff had no problems with bathing and dressing or preparing his own food and meals daily. Tr. 17. Plaintiff was able to drive and ride in a car for up to one-half hour before feeling pain. He had no problems shopping for clothes or personal items once per week. Plaintiff read and watched television, spoke to his friends on the telephone, used the computer, and occasionally went to the movies and out to dinner. Plaintiff enjoyed walking in the mall once a week. Tr. 17. Evidence that Plaintiff is capable of engaging in varied activities despite allegations of severe pain is supportive of a conclusion that Plaintiff's alleged pain is not disabling. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (ALJ found Poupore's subjective complaints of pain not fully credible when evidence showed that he cared for his one-year old child, including changing diapers, occasionally washed dishes, vacuumed, and drove, watched television and used the computer); *Rivera v. Harris*, 623 F.3d 212, 216 (2d Cir. 1980) (ALJ considered plaintiff's own testimony, including statements that despite pain, plaintiff was able to cook, sew, wash, and shop, although slowly, and with an afternoon break).

Based on the foregoing, the ALJ reasonably found Plaintiff's subjective allegations not entirely credible.

**5.  Need to Consult a Vocational Expert at Step 5**

Finally, Plaintiff argues that the ALJ erred because Plaintiff suffers from

nonexertional limitations which required the ALJ to consult a vocational expert

in making the disability determination.

At step 5 in the sequential evaluation, an ALJ is required to perform a two part

process to first assess Plaintiff's job qualifications by considering his physical ability, age,

education, and work experience, and then determine whether jobs exist in the national

economy that Plaintiff could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §

404.1520(f); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983). The second part of this

process is generally satisfied by referring to the applicable rule of the Medical-Vocational

Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grid"). *See Bapp*

*v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  "The Grid takes into account the claimant's

residual functional capacity in conjunction with the claimant's age, education and work

experience. Based on these factors, the Grid indicates whether the claimant can engage

in any other substantial gainful work which exists in the national economy." *Zorilla v.*

*Chater*, 915 F. Supp. 662, 667 (S.D.N.Y.1996).[3]

 "Generally the result listed in the Grid is dispositive on the issue of disability." *Id.*

However, if the claimant has nonexertional impairments, the ALJ must determine whether

those impairments "significantly" diminish the claimant's work capacity beyond that caused

---

[3]"The Grid classifies work into five categories based on the exertional requirements of the different
jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of
requirements in the primary strength activities of  sitting, standing, walking, lifting, carrying, pushing, and
pulling." *Zorilla*, 915 F. Supp. at  667 n. 2; *see* 20 C.F.R. § 404.1567(a). Upon consideration of the claimant's
residual functional capacity, age, education, and prior work experience, the Grid yields a decision of
"disabled" or "not disabled." 20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

by his or her exertional limitations. *Id.* A claimant's work capacity is "'significantly diminished' if there is an 'additional loss of work capacity . . . that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Id.*(quoting *Bapp*, 802 F.2d at 606). If a claimant's work capacity is significantly diminished by non-exertional impairments beyond that caused by his or her exertional impairment(s), then the use of the Grids may be an inappropriate method of determining a claimant's residual functional capacity and the ALJ may be required to consult a vocational expert. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996); *Bapp*, 802 F.2d at 604-605.

Here, Dr. Mendoza opined that Plaintiff had numerous postural and environmental limitations . T 325-26 . Dr. Jones opined that Plaintiff was a candidate for pain management, and then he "can only do sedentary work with no bending, or lifting, or reaching. He must be able to change position as needed." T354 .

The ALJ concluded that Plaintiff could perform sedentary work with no bending or lifting. "Sedentary work 'entails no significant stooping.'" *Martin v. Astrue*, 337 Fed. Appx. 87, 90 (2d Cir. 2009)(quoting SSR 83-10). Thus, the ALJ's determination is not in conflict with the medical evidence presented in this matter. Moreover, the record does not support Plaintiff's contention that his obesity or use of the back brace or cane significantly diminishes his capacity to perform unskilled sedentary work beyond that caused by his exertional limitations. Accordingly, the ALJ's determination to rely on the Grid is not improper.

## V. CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings is DENIED, the Defendant's motion is GRANTED, and the decision of the

Commissioner is AFFIRMED .

**IT IS SO ORDERED**

**Dated:** September 26, 2012

Thomas J. McAvoy
Senior, U.S. District Judge